IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**JOGLOR, LLC**,

    Plaintiff,

v.

**FIRST AMERICAN TITLE INSURANCE COMPANY**,

    Defendant.

Civil No. 15-1088 (BJM)

**OPINION AND ORDER**

    Joglor, LLC ("Joglor") brought this action under the court's diversity jurisdiction against First American Title Insurance Company ("FATIC" or "Company"), alleging breach of two title insurance policies, bad-faith handling of Joglor's insurance claims, and entitlement to attorney's fees and costs. Docket No. 1 ("Compl."). Seeking a declaratory judgment, the Company counterclaimed. Docket No. 13. The parties stipulated to the dismissal of the bad-faith claim, and so that claim was dismissed. Docket Nos. 84, 105. Joglor and FATIC cross-moved for summary judgment, Docket Nos. 59, 67, and opposed each other's motions. Docket Nos. 77, 90, 114, 127, 128, 143. The case is before me on consent of the parties. Docket No. 24.

    For the reasons set forth below, the Company's motion is **GRANTED**, and Joglor's motion is **DENIED**.

**SUMMARY JUDGMENT STANDARD**

    Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the

initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[1] submissions.[2] The facts giving rise to this case are largely undisputed.

### *The Actors*

The Company is a Nebraska corporation authorized by the Puerto Rico Insurance Commissioner's Office to sell title insurance in Puerto Rico. CSUF ¶ 1. Joglor is a Puerto

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[2] The Company's Statement of Uncontested Facts ("CSUF"), Docket No. 60; Joglor's Statement of Uncontested Facts ("JSUF"), Docket No. 68; Joglor's Opposing Statement of Facts ("JOSF"), Docket No. 78; Company's Opposing Statement of Facts ("COSF"), Docket No. 91 at 1–25; Company's Additional Statement of Facts ("CASF"), Docket No. 91 at 25–36; and Joglor's Response to the CASF ("RCASF").

Rico limited liability company whose sole and controlling member is Jose Figueroa Morales ("Figueroa"). CSUF ¶ 2. As Joglor's executive director, Figueroa, who is authorized to practice law in Puerto Rico, negotiates on behalf of Joglor and makes its day-to-day decisions. CSUF ¶¶ 3, 5. Armando Orol Mesa ("Orol") is a certified public accountant who provides consulting and tax-preparation services to Joglor. CSUF ¶ 6. Since around 2006, Figueroa and Orol have owned Ecoland, Inc. ("Ecoland"), which was formerly doing business as Top Security Home Developers, Inc. ("Top Security"). CSUF ¶¶ 8, 10. Figueroa is Ecoland's president, and Orol is Ecoland's secretary. CSUF ¶ 9.

In August 2006, Figueroa sought two credit lines from Banco Popular de Puerto Rico ("Banco Popular" or "BPPR") to complete an industrial and residential real estate development project on lands previously purchased by his company. CSUF ¶ 18. Figueroa signed two credit line agreements between Ecoland (known as Top Security at the time) and Banco Popular, one for $700,000 of credit and the other for $2,000,000 of credit. CSUF ¶ 11. At that time, Figueroa also executed two promissory notes to the order of Banco Popular that corresponded to the amounts of credit Ecoland obtained. CSUF ¶ 12. The $700,000 promissory note (the "$700,000 Mortgage Note") was to be secured by a first mortgage lien over seven properties in Puerto Rico. CSUF ¶ 13. And the $2,000,000 promissory note (the "$2,000,000 Mortgage Note") was to be secured by a first mortgage lien over five different properties in Puerto Rico. CSUF ¶ 14.

Figueroa also signed two pledge agreements in favor of Banco Popular in which the $700,000 and $2,000,000 Mortgage Notes were pledged and delivered as collateral security for the lines of credit granted to Ecoland. CSUF ¶ 15. In addition, Orol, Figueroa, and Figueroa's wife, Gloria Maria Santaella Paris ("Santaella"), signed agreements in their personal capacities to guarantee the funds granted by the lines of credit. CSUF ¶¶ 16, 17.

*The Insurance Policies*

As part of the transaction for financing the two lines of credit, FATIC issued two title insurance policies (one for $700,000 and another for $2,000,000) that corresponded to

the mortgage deeds contemplated by the two promissory notes. CSUF ¶¶ 19–22, 24–25. Both policies named the insured as Banco Popular "and/or its successors and assigns as their respective interests may appear." CSUF ¶ 23 (emphasis removed). Both insurance policies also state that the insurance coverage is "subject to" the "conditions and stipulations" contained in the policy. CSUF ¶ 26 (emphasis removed). Section 9 of the Conditions and Stipulations of both policies states as follows:

> 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.
> (a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.
> (b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.
> (c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

CSUF ¶ 28. And the pertinent part of Section 2(a) of the Conditions and Stipulations of both policies reads as follows:

> (a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires

> all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

CSUF ¶ 29.

*The Settlement & Release Agreement*

In February 2013, Banco Popular informed Figueroa, Santaella, and Orol of arrears due on the $700,000 and $2,000,000 credit lines, as well as a third loan, and demanded payment of the loan balances. CSUF ¶¶ 32–34. The third loan had been issued to Joblar, Inc. ("Joblar"), a separate entity whose shareholders are Figueroa, Orol, and Blas Buono-Correa ("Buono"). CSUF ¶ 33. After receiving the demand for payment, Figueroa and Orol negotiated with Banco Popular's attorneys and reached a "Settlement and Release Agreement" ("Settlement Agreement") in September 2013. CSUF ¶¶ 35, 36. Figueroa executed this agreement in his personal capacity, and as an authorized representative of Ecoland and Joblar. CSUF ¶ 37.

The loan agreements encompassed by the Settlement Agreement were the following: (1) the $2,000,000 line of credit agreement, the line of credit itself, and the $2,000,000 Mortgage Note; (2) the $700,000 line of credit agreement, the line of credit itself, and the $700,000 Mortgage Note; and (3) the third loan issued to Joblar. CSUF ¶ 38. Also encompassed by the Settlement Agreement were Ecoland's two pledge agreements and the guarantees signed by Figueroa, Santaella, Orol, and Buono. CSUF ¶ 39. The Settlement Agreement referred to these documents as the "Loan Documents." CSUF ¶ 40.

After acknowledging that the Loan Documents were due and payable, and that Banco Popular could accelerate the payments and request the full payment and satisfaction of all the amounts due under the Loan Documents, CSUF ¶ 42, the Settlement Agreement stated that:

> the Debtors have requested BPPR to accept the amount of $1,400,000.00 (the "Settlement Amount") as full payment and satisfaction of the Debt, and to discharge all outstanding obligations and liabilities with respect thereto, and BPPR has agreed to do so, subject to the terms and conditions hereof.

CSUF ¶ 43. Articles 2, 3, 4, and 5 of the Settlement Agreement, all of which are relevant to the parties' respective positions, provide as follows:

> 2. Payment of Settlement Amount. The Debtors hereby pay and deliver to BPPR the Settlement Amount, by means of a certified check issued by a federally insured financial institution and payable to the order of BPPR, the receipt of which is acknowledged by BPPR and which amount is accepted as full payment and satisfaction of the Debt.
>
> 3. Release of Obligations. In consideration of the payment hereby made by the Debtors to BPPR, as full payment and satisfaction of the Debt, BPPR hereby release the Debtors from any and all further obligations and liabilities with respect to the Debt.
>
> 4. Release of Collateral Security. Upon the execution of this Settlement Agreement, BPPR will deliver to the Debtors the Loan Documents (original or copies thereof, as applicable), including the original Mortgage Notes duly endorsed to Joglor, LLC, as instructed by the Debtors, without recourse, representation or warranty of any kind. The execution, delivery and filing of any document or instrument required for the release and/or cancellation of any collateral security, including, without limitation, the Mortgage Notes and the Mortgages, shall be performed by the Debtors, or any other person or entity, at their own cost and expense. BPPR makes no representation or warranty as to the validity, effectiveness, enforceability, perfection or priority of any collateral security.
>
> 5. Release and Indemnity. In consideration of the present settlement and release, the Debtors, on their behalf and on behalf of their affiliates, subsidiaries, parents, heirs, officers, shareholders, members, partners, directors, managers, employees, attorneys, contractors, and agents, and their respective successors and assigns, hereby release and agree to indemnify and hold harmless BPPR and its affiliates, subsidiaries, parents, heirs, officers, shareholders, members, partners, directors, managers, employees, attorneys, contractors, and agents, and their respective successors and assigns, and BPPR hereby releases and agrees to indemnify and hold harmless the Debtors, from and against any action, cause of action, suit, damage, claim, obligation, liability, demand, costs and expenses of any kind whatsoever, at law or in equity, past or present, known or unknown, that may be directly or indirectly related to, arise from or otherwise connected with (i) the Debt, the Loans, the Loan Documents, the Properties (including, without limitation, any property taxes levied upon or assessed against the Properties), or the transactions contemplated thereby or any actions or omissions in connection therewith; and (ii) any aspect of the dealings or relationships between the Parties relating to any or all of the documents, transactions, actions or omissions referenced herein, except that this release

> and indemnification shall not apply to any claims that may arise as a result of the breach of this Settlement Agreement. In entering into this Settlement Agreement, the Parties represent to each other that they had adequate opportunity to consult with legal counsel and hereby agree and acknowledge that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, act or omissions or the accuracy, completeness or validity hereof. Furthermore, the Parties hereby agree and acknowledge that the releases set forth above shall not be interpreted or construed as a release of any other obligations of the Debtors with BPPR and all such obligations and undertakings of the Parties with respect thereto shall continue in full force and effect.

CSUF ¶ 44. Article 10 provides that the Settlement Agreement is binding upon the parties and their respective successors and assigns. CSUF ¶ 45.

Article 11 of the Settlement Agreement contains integration and merger clauses, which state that the Settlement Agreement is the "entire agreement" between the parties and "revokes all prior agreements and/or understandings with respect to the subject matter" of the Settlement Agreement. CSUF ¶ 46. Joglor acknowledges that it had knowledge of all the terms and conditions of the Settlement Agreement, and that, in September 2013, Morales issued a check payable to Banco Popular for $1,400,000 on Joglor's behalf. CSUF ¶¶ 48, 49; OSF ¶ 49. That same month, and per Article 4, Banco Popular endorsed the $700,000 and $2,000,000 Mortgage Notes to the order of Joglor. CSUF ¶ 50.

**Joglor's Insurance Claims**

In October 2014, the Company received insurance claims from Joglor that pertained to the two title insurance policies issued to Banco Popular in February 2013. CSUF ¶ 55. Joglor claimed that Banco Popular assigned the mortgage notes to Joglor, and that the mortgage deeds intended to secure the $700,000 and $2,000,000 Mortgage Notes could not be registered in the Puerto Rico Registry of Property due to various reasons. CSUF ¶¶ 56, 58. At that time, Joglor did not inform FATIC that it had obtained the Mortgage Notes as a result of the Settlement Agreement, and the Company did not obtain a copy of the Settlement Agreement until the parties were conducting discovery around April 2015. CSUF ¶¶ 59, 60. The parties presently dispute whether the Company was aware that the

mortgage deeds were not recordable, as well as whether the mortgage deeds are susceptible to recordation. CSUF ¶ 57; JSOF ¶ 57; JSUF ¶¶ 17, 34; CSOF ¶¶ 17, 34.

## DISCUSSION

Joglor contends that it is entitled to summary judgment because Banco Popular endorsed the mortgage notes to the order of Joglor and FATIC's insurance policies cover an insured's losses when the mortgage liens cannot be recorded. Docket Nos. 67, 78. The Company denies liability, arguing that the two title insurance policies terminated when Banco Popular and Ecoland reached the Settlement Agreement that satisfied the debt obligations imposed by the mortgage notes. Docket No. 59. Alternatively, the Company contends Joglor is not entitled to summary judgment because it is unsettled at this point whether the mortgage notes can be recorded.[3] Docket No. 90.

**I.     Insurance Contracts**

It is uncontested that Puerto Rico insurance law applies to this diversity action. *See, e.g.*, *AJC Int'l, Inc. v. Triple-S Propiedad*, 790 F.3d 1, 3 (1st Cir. 2015). The Puerto Rico Insurance Code, P.R. Laws Ann. tit. 26, § 101 *et seq.*, which controls the interpretation of insurance contracts, provides that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." *Id.* § 1125.

"Absent an ambiguity, [the court] must interpret the insurance contract according to its 'plain meaning, as a whole, and in harmony with the general purposes of the policy.'" *Vazquez-Filippetti v. Cooperativa de Seguros Multiples de P.R.*, 723 F.3d 24, 29 (1st Cir. 2013) (quoting *Jewelers Mut. Ins. Co. v. N. Barquet, Inc.*, 410 F.3d 2, 16 (1st Cir. 2005)). "When the Insurance Code of Puerto Rico does not provide an interpretative approach for a particular situation, the Civil Code is used as a supplemental source of law in interpreting

---

[3] Because the Company's first argument is meritorious, there is no need determine whether the mortgage deeds are susceptible to being recorded in the Puerto Rico Registry of Property.

the insurance contract." *Nieves v. Intercontinental Life Ins. Co. of P.R.*, 964 F.2d 60, 63 (1st Cir. 1992). "Article 1233 of the Puerto Rico Civil Code provides that when 'the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.'" *Id.* (quoting P.R. Laws Ann. tit. 31, § 3471).

Contracts for insurance "are considered adhesion contracts under Puerto Rico law," and so they are "liberally construed in favor of the insured." *Nieves*, 964 F.2d at 63; *see also Quiñones López v. Manzano Pozas*, 141 P.R. Dec. 139, 155 (1996) ("[N]ice constructions that would allow insurers to dodge liability are not favored."). However, Puerto Rico law does "*not* compel constructions in favor of the insured when a clause favors the insurer, and its meaning and scope is [sic] clear and unambiguous." *Triple-S Propiedad*, 790 F.3d at 4 (quoting *Quiñones López*, 141 P.R. Dec. at 155 (citing cases)). Accordingly, if an insurance clause is unambiguous and favors the insurer, the unambiguous clause "should be held as binding on the insured." *Triple-S Propiedad*, 790 F.3d at 4 (quoting *Quiñones López*, 141 P.R. Dec. at 155). As discussed below, the Company asserts that both title insurance policies contain such a clause.

## II. Termination of Liability

FATIC argues that the execution of the Settlement Agreement triggered an unambiguous clause in the insurance policies that terminated the Company's liability. Docket No. 59. Joglor maintains that the Company waived this argument by not asserting it with sufficient specificity in the answer to the complaint, and that the argument lacks merit in any event. Docket No. 77.

### A. Waiver

Federal Rule of Civil Procedure 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c). "Generally speaking, failure to plead an affirmative defense results in a waiver of the defense and the exclusion of all evidence relevant to it." *Conjugal Partnership v. Conjugal*

Joglor, LLC v. First American Title Insurance Company, Civil No. 15-1088 (BJM)                                                                 10

*Partnership*, 22 F.3d 391, 400 (1st Cir. 1994). "The purpose of Rule 8(c) is to give the court and the other parties fair warning that a particular line of defense will be pursued." *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir. 1995), *abrogated on other grounds by Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136 (1st Cir. 2000). "Hence, a defendant who fails to assert an affirmative defense at all, or who asserts it in a largely uninformative way, acts at his peril." *Williams*, 45 F.3d at 593.

But, where "a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it, a mere failure to plead the defense more particularly will not constitute a waiver." *Id.* In *Williams*, for example, the First Circuit held that the defendant did not waive a preemption defense although the answer "did not specifically mention" it. *See Williams*, 45 F.3d at 593. The *Williams* court held so because (1) the answer contained "a broader Rule 12(b)(6) defense that was capable of encompassing [the] preemption" defense, and (2) the totality of the circumstances indicated that Rule 8(c)'s core purpose had been vindicated. *Id.* (plaintiff was not ambushed by defense where the defendant amplified its position prior to the close of discovery and the parties briefed the issue during summary judgment); *see also Shapiro v. Haenn*, 222 F. Supp. 2d 29, 43 (D. Me. 2002) ("because it d[id] not appear that Plaintiff ha[d] been prejudiced by Defendant . . . raising the . . . defense for the first time on summary judgment, the Court . . . consider[ed] the defense").

In this case, FATIC asserted a 12(b)(6) defense in its answer, and that defense is broad enough to encompass situations where the defendant-insurer denies insurance coverage. Docket No. 13 at 11 ¶ 1; *see 84 Albany Ave. Realty Corp. v. Standard Fire Ins. Co.*, 13 F. Supp. 3d 241, 245 (E.D.N.Y. 2014) ("there was no insurance coverage in place when Plaintiff sustained" losses, and so the complaint "fail[ed] to state a claim for relief"). Second, Joglor acknowledges that the Company did not obtain a copy of the Settlement Agreement until the parties were conducting discovery in April 2015. OSF ¶¶ 59, 60; *see also* Docket No. 13 at 11–12 ¶¶ 2–3. And before that time, the Company sought the

Settlement Agreement from Joglor—arguing that the documents were necessary for the Company to mount a complete defense—but Joglor resisted disclosure on confidentiality grounds and asked Banco Popular not to disclose the document to FATIC. Docket Nos. 29-1–29-14, 31, 36. Third, Joglor and the Company had an opportunity to brief the defense FATIC seeks to assert, and both parties took advantage of that opportunity. Under these circumstances, as in *Williams*, Joglor cannot claim that it was ambushed or prejudiced by FATIC raising the termination-of-liability defense at the summary-judgment stage. *See Williams*, 45 F.3d at 593; *see also Shapiro*, 222 F. Supp. 2d at 43. Thus, FATIC's defense was not waived, and will be considered.

    **B.**    **Section 9(c)**

The Company underscores the plain language of Section 9(c), and argues that this clause (which is included in both title insurance policies) militates toward the conclusion that FATIC's liability terminated when the Settlement Agreement was executed. Section 9(c) provides that "[p]ayment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations." Docket Nos. 60-22 at 2, 60-23 at 2. The Company contends that the exception in Section 2(a) is inapplicable in this case, and Joglor did not argue to the contrary. *Compare* Docket No. 59 at 7 n.4, *with* Docket Nos. 77, 127.

Courts that have interpreted Section 9(c), as well as materially similar clauses in other title insurance policies, have held that "once the mortgage [is] paid," the title insurer's "obligations under the policy [have] ended." *Morrison v. Wells Fargo Bank, N.A.*, 711 F. Supp. 2d 369, 389 (M.D. Pa. 2010) (Section 9(c) counseled summary judgment in favor of the title insurer); *Paramount Properties Co. v. Transamerica Title Ins. Co.*, 1 Cal. 3d 562, 568 (1970) ("In the usual case" a clause materially similar to Section 9(c) "would operate in a straightforward manner; once a lender has been paid in full he normally no longer has an interest in the title of the underlying security"); *RNT Holdings, LLC v. United Gen. Title Ins. Co.*, 230 Cal. App. 4th 1289, 1298 (2014) (trial and appellate court reached same

conclusion with respect to a clause materially similar to Section 9(c)); *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 355 Ill. App. 3d 546, 554 (2005) ("where the mortgage loan that was insured by the title policy is paid or voluntarily satisfied, the insurer's liability under the title policy is terminated"), *aff'd*, 218 Ill. 2d 326 (2006); *Title Guar. & Trust Co. v. Johnson*, 485 S.W.2d 764, 767 (Tenn. Ct. App. 1972); *see also* Barlow Burke, *Law of Title Insurance*, §3.02[D] ("a policy of lender's title insurance can be terminated by the release or satisfaction of the debt. If the lien is released, so is the insurance for the lien."); 11 Steven Plitt et al., *Couch on Insurance* § 159:93 (3d ed. June 2016) (same).

*Morrison* aptly illustrates a situation where Section 9(c) is triggered, as well as the effect of the clause's plain meaning. 711 F. Supp. 2d at 374. In that case, a couple "executed a mortgage that purported to impose a lien on property owned by the plaintiff, whose name was identical to that of the man who signed the mortgage." *RNT Holdings*, 230 Cal. App. 4th at 1298. "In connection with the mortgage, an insurer issued a lender's title policy, which contained" the Section 9(c) coverage condition. *Id.* (citing *Morrison*, 711 F. Supp. at 388–89). "After the plaintiff initiated a tort action against the lender, the lender commenced a cross-action against the [title] insurer." *RNT Holdings*, 230 Cal. App. 4th at 1298 (citing *Morrison*, 711 F. Supp. at 388–89).

"Later, while the plaintiff's action was pending, the mortgage was paid in full, and the insurer declined to provide any further defense to the lender in the plaintiff's action." *RNT Holdings*, 230 Cal. App. 4th at 1298 (citing *Morrison*, 711 F. Supp. at 375–76). "The lender then amended its complaint to assert claims for breach of insurance contract and bad faith predicated on that denial." *RNT Holdings*, 230 Cal. App. 4th at 1298 (citing *Morrison*, 711 F. Supp. at 375–76). "Relying on the policy's coverage condition," the district court "granted summary judgment in the insurer's favor on those claims, concluding that the insurer's obligations ended when the mortgage was paid in full." *RNT Holdings*, 230 Cal. App. 4th at 1298 (citing *Morrison*, 711 F. Supp. at 386–90).

As in *Morrison*, the terms of the Settlement Agreement indicate that Section 9(c) was triggered when the agreement was executed, and so FATIC's liability under the two title insurance policies terminated at that time. 711 F. Supp. 2d at 374. The Settlement Agreement is abundantly clear that the Ecoland "requested BPPR to accept the amount of $1,400,000.00 (the 'Settlement Amount') *as full payment and satisfaction of the Debt*" which arose from the Loan Documents, and that Banco Popular "agreed to do so." CSUF ¶¶ 42, 43 (emphasis added). In addition, Article 3 of the Settlement Agreement, which is titled "Release of Obligations," states that "[i]n consideration of the payment . . . made by the Debtors to BPPR, as *full payment and satisfaction* of the Debt, BPPR . . . *release[d]* the Debtors from any and all further obligations and liabilities with respect to the Debt." CSUF ¶ 44 (emphases added). What is more, Article 5 provides that Banco Popular released the debtors from claims relating to "the Debt, the Loans, [and] the Loan Documents." CSUF ¶ 44. These clauses of the Settlement Agreement could hardly be more pellucid, and unambiguously establish that Section 9(c) of the title insurance policies was triggered when the Settlement Agreement was executed.[4]

Notwithstanding the above, Joglor contends that it received the endorsed mortgage notes from Banco Popular per Article 4 of the Settlement Agreement, that the mortgage notes were never cancelled, and that FATIC's insurance policies remained valid when the notes were assigned to Joglor. But under Puerto Rico law, "the mortgage contract presupposes the existence of two legal concepts": "a principal obligation and the mortgage itself, which serves as security to the . . . creditor. A mortgage cannot be thought of without a secured obligation." *Liechty v. Descartes Sauri*, 9 P.R. Offic. Trans. 660 (P.R. 1980). Because "a mortgage is accessory to a principal debt," it "automatically falls when the

---

[4] In this vein, Joglor argues that FATIC "relies on obscure, ambiguous or confusing language of the Policies to deny liability." Docket No. 77 at 8. In *First Midwest Bank*, the court considered a similar argument within the context of a title insurance policy containing a clause similar to Section 9(c), and held "that the policy is not ambiguous or contradictory." 355 Ill. App. 3d at 556.

underlying debt does." *FDIC v. Bracero & Rivera, Inc.*, 895 F.2d 824, 827 (1st Cir. 1990). Put another way, the "mortgage effectively subsists while the credit it secures is outstanding. When the credit is extinguished, the mortgage is extinguished; when the credit is transmitted, the mortgage is transmitted; the voidness or ineffectiveness of the credit causes the voidness or ineffectiveness of the mortgage." *Liechty*, 9 P.R. Offic. Trans. 660. Puerto Rico law provides that a person entitled to enforce an instrument (i.e., Banco Popular and the mortgage notes) "may discharge the obligation of a party to pay the instrument . . . by agreeing not to sue or otherwise renouncing rights against the party by a signed writing." P.R. Laws Ann. tit. 19, § 754(a). In addition, the "obligation of a party to pay the instrument is discharged . . . by an act or agreement with the party which would discharge an obligation to pay money under a simple contract." *Id.* § 751(a).

Here, the terms of the Settlement Agreement indicate that Banco Popular accepted as "full payment" the settlement amount in exchange for releasing Ecoland and the other debtors from their obligations under the Loan Documents, which included the two mortgage notes. Accordingly, the mortgage notes and mortgage liens were discharged when the Settlement Agreement was executed. *See* P.R. Laws Ann. tit. 19, §§ 751(a), 754(a); *Bracero & Rivera*, 895 F.2d at 827 (promissory note and mortgage lien were "discharged by the payment and cancellation of the underlying debt"). And this is so even if the notes themselves were not marked "cancelled" or "void." *See id.* ("fact that the public registration of the mortgage was not formally cancelled does not automatically mean that [debtor] would have remained liable on the note to [the trust company], and subsequently to FDIC," which acquired the note as the trust company's receiver).

Moreover, Joglor cannot claim that it acquired rights of a holder in due course of the mortgage notes without notice of their discharge because it readily acknowledged awareness of the terms of the Settlement Agreement. *See* P.R. Laws Ann. tit. 19, § 751(b) (discharge ineffective as to person "acquiring rights of a holder in due course of the instrument without notice of the discharge."). In light of the foregoing, the mortgage notes

that Joglor received per Article 4 of the Settlement Agreement were effectively extinguished obligations that did not carry valid title insurance policies as a result of Section 9(c)'s plain meaning.

In a last-ditch attempt to buttress its position, Joglor relies on *Eastern Sands, Inc. v. Roig Commercial Bank*, 140 D.P.R. 703 (1996). Docket No. 135-1 (certified translation). In that case, the Puerto Rico Supreme Court held that "when a debt is paid off by a third party, this may cause such third party to be subrogated to the rights of the original creditor, in which case the obligation and its guarantees are not extinguished. Such novation is of a modifying nature," and "despite the changes, the principal obligation subsists and no other obligation is created to substitute it." *Id.* at 713. But importantly, the *Eastern Sands* court made clear that "the manner in which the payment is made will determine whether the novation is extinctive or merely modifying; that is, whether the principal obligation is extinguished or not." *Id.* "The payment that leads to the subrogation is treated as a modifying novation, *where the only resulting change is in the identity of the creditor*, not the effectiveness of the principal obligation." *Id.* (emphasis in original).

Joglor's reliance on *Eastern Sands* is misplaced because the terms of the Settlement Agreement—which disclose "the manner in which the payment" was made to Banco Popular by Joglor—indicates that Banco Popular released Ecoland and the other debtors from the obligations created by the Loan Documents, which included the mortgage notes. 140 D.P.R. at 712–13 (generally, "[o]nce the debt [is] paid off, the pledge [can] not be returned to any party other than [the debtor-mortgagor] or a representative designated to receive it"). Accordingly, Ecoland's principal obligations under the mortgage notes were extinguished, as opposed to modified, and so the rule in *Eastern Sands* is inapposite here. *See id.* at 713. In sum, because the unambiguous language of Section 9(c) terminated FATIC's two title insurance policies when the Settlement Agreement was executed, and because the authority on which Joglor relies is not to the contrary, Joglor is not entitled to

be indemnified by the Company. Therefore, the Company is entitled to summary judgment, and Joglor's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the Company's motion for summary judgment is **GRANTED**, and Joglor's motion for summary judgment is **DENIED**. The claims in Joglor's complaint are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of September 2016.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge